UNITED STATES DISTRICT COURT
DISTRICT OF VERMONT

United States of America

v.                                              Criminal No. 23-cr-00056/03

Nasir Hussain

## ORDER GRANTING JUDGMENT OF ACQUITTAL

This case involves the proof required to support a conviction for conspiracy to commit wire fraud, and particularly to prove the defendant's culpable mental state or *mens rea*. Nasir Hussain was convicted by a jury of one count of conspiracy to commit wire fraud under 18 U.S.C. § 1349. He timely moved for acquittal under Fed. R. Crim. P. Rule 29 on the basis that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he knowingly and willfully took part in the charged conspiracy to defraud, in the sense that the evidence lacked proof of the defendant's intent that the crime of wire fraud (as opposed to some other offense) be committed.

There was no doubt that the evidence proved that Hussain knowingly participated in a criminal conspiracy involving monetary transactions; the question is whether the evidence proved beyond a reasonable doubt that the defendant knew the conspiracy involved wire fraud, which is necessary to establish the required element of the defendant's specific intent that wire fraud (and not some other offense) be committed by the conspirators.

1

In addition to the optional pretrial memoranda filed by both parties, the court ordered preparation of the trial transcript and extensive post-trial briefing on the motion.

This case was presented by the prosecutors competently, skillfully, and with a high degree of professionalism. But the presentation lacked sufficient evidence of, and perhaps insufficient emphasis on, the defendant's culpable mental state. Thus, after considering the evidence produced at trial, the parties' briefing, and oral argument, the court grants the defendant's motion.

## I.    Legal Standard

*In general.*    "After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). "The test for sufficiency . . . is 'whether a rational jury could conclude beyond a reasonable doubt that a defendant is guilty of the crime charged.'" *United States v. Eppolito*, 543 F.3d 25, 45 (2d Cir. 2008) (citations omitted). The burden on defendant is "heavy," as "the standard of review is exceedingly deferential." *United States v. DiMassa*, 117 F.4th 477, 487 (2d Cir. 2024) (quoting *United States v. Baker*, 899 F.3d 123, 129 (2d Cir. 2018)). When reviewing the sufficiency of the evidence, a court "must view the evidence in the light most favorable to the Government, crediting every inference that could have been drawn in the Government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence." *Id.* (citing *United States v. Brock*, 789 F.3d 60, 63 (2d Cir. 2015)).

"This standard of deference is especially important when reviewing a conviction

of conspiracy." *United States v. Nusraty*, 867 F.2d 759, 762 (2d Cir. 1989). "'[A]

conspiracy by its very nature is a secretive operation,' and [] the '[e]xistence of and

participation in a conspiracy . . . may be established . . . through circumstantial

evidence.'" *United States v. Gaviria*, 740 F.2d 174, 183 (2d Cir. 1984) (internal citations

omitted). A defendant "need not have known all of the details of the broader conspiracy

at the time he agreed to enter the scheme," but he "must at least have had knowledge that

a common endeavor existed." *Nusraty*, 867 F.2d at 763. "In other words, there must 'be

some evidence from which it can reasonably be inferred that the person charged with

conspiracy knew of the existence of the scheme alleged in the indictment and knowingly

joined and participated in it.'" *Id.* (citations omitted).

   ***The element of the offense at issue: specific intent to commit wire fraud.*** But

even this can be insufficient to prove conspiracy because, "[w]here the crime charged is

conspiracy, a conviction cannot be sustained unless the Government establishes beyond a

reasonable doubt that the defendant had the *specific intent to violate the substantive

statute[s]*.'" *Gaviria*, 740 F.2d at 183 (quoting *United States v. Soto*, 716 F.2d 989, 993

(2d Cir.1983)) (emphasis added); *see also United States v. D'Amato*, 39 F.3d 1249, 1256

(2d Cir. 1994) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)) ("[T]he government

must introduce sufficient evidence to allow the jury to reasonably infer that each essential

element of the crime charged has been proven beyond a reasonable doubt.").

   Because "[i]t would not satisfy the [Constitution] to have a jury determine that the

defendant is *probably* guilty," evidence in "equipoise" cannot support a conviction.

*United States v. Coplan*, 703 F.3d 46, 69 (2d Cir. 2012) (quoting *Sullivan v. Louisiana*,

508 U.S. 275, 278 (1993)) (emphasis in original). "[I]f the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citations and quotations omitted). "Innocence" in this context, of course, does not refer to innocence of criminal conduct or even culpable criminal intent, but to lack of proof beyond a reasonable doubt of the specific crime charged in the indictment.

## II.    Facts

The charged wire fraud conspiracy consisted of callers, probably in India, who contacted victims in the United States, impersonating well-known American companies, and convinced the victims to allow them to take control of their computers and transfer funds out of their bank accounts into accounts controlled by conspirators. The trial included extensive evidence that Hussain directly or indirectly controlled accounts into which the victims' money was transferred, and that he would transfer the deposited funds back to India, keeping some for himself and his associates in the United States. As part of the conspiracy, Hussain directed those associates to open the accounts at banks he chose, using false information he provided, in return for a commission. Hussain arranged travel for his associates to open bank accounts at banks in various cities and gave them false addresses and employment information to use when opening the accounts. The trial evidence demonstrated convincingly that Hussain was engaged in deceptive (though not *fraudulent*) dealings with domestic banks involving criminally derived funds.

But the trial included no direct evidence that Hussain had knowledge of the scam

4

phone call operation that generated the funds flowing through the accounts he arranged for and controlled. The government argues that his knowledge and willing participation in the scam phone call operation can be inferred through one piece of quasi-direct evidence and the totality of the circumstantial evidence. The court disagrees.

Crucial to understanding this case and this motion is that both the prosecution and the defense agreed that the conspiracy had two components: the component (that likely operated in and from India) which defrauded victims through phony scam telephone calls; and a component based in the United States, at least a portion of which was managed by Hussain, which involved opening American bank accounts to receive funds derived from those phony calls before finally transferring those funds to sources in India.

There was abundant evidence of Hussain's involvement in the second component—arranging the opening and receipt of funds into bank accounts he controlled—which was unquestionably integral to the conspiracy, and about which he had full knowledge. But the parties also agreed that this second U.S.-based component of the conspiracy, involving the opening and running of funds through bank accounts, did not demonstrably involve wire fraud. So the defendant's participation in and direction of these activities was not evidence of his specific intent to commit wire fraud.

And there was little if any evidence connecting Hussain with the actual workings of the first, victim-facing component of the conspiracy, which clearly did involve wire fraud: the scam telephone calls that defrauded victims by persuading those victims to permit the criminals to access and empty their bank accounts. In fact, the prosecution presented no evidence about the identity of the callers, no evidence of how Hussain was

5

connected with the callers, and no evidence of any communications between Hussain and

the callers.[1]  The prosecution presented no evidence about the size of the fraud conspiracy

as a whole or who directed the conspiracy.  For example, Hussain could have been

connected with the victim-facing component of the conspiracy through an intermediary,

as a hired or affiliated money-launderer, or as a member of a criminal organization that

was involved in several different types of crime, including wire fraud.  Simply put, there

was no evidence adduced showing any direct communication between Hussain and the

scam callers.

This presents a problem for the prosecution because, as the Second Circuit Court

of Appeals explained in the *Gaviria* case, "a conviction cannot be sustained unless the

government establishes beyond a reasonable doubt that the defendant had the *specific*

*intent to violate the substantive statute*" which was the objective of the conspiracy.

*Gaviria*, 740 F.2d at 183 (emphasis added).  In other words, the prosecution had to prove

not only that Hussain participated in a criminal conspiracy that generated money flowing

into bank accounts (the government clearly proved that), but that Hussein knowingly and

willfully participated in a conspiracy *to commit wire fraud*, with a specific intent to

commit wire fraud—*and not some other crime*.  As explained below, at no time during the

trial—opening statements, evidence, or closing arguments—did the prosecution expressly

---

[1] As discussed *infra* Part III.b, the prosecution did present circumstantial evidence that Hussain
was in contact with the callers because the callers knew the account numbers for the bank
account Hussain controlled, and Hussain knew the timing of deposits being made into the
accounts.  But the prosecution produced no evidence that Hussain ever actually communicated
with the callers, as opposed to, for instance, an intermediary, and no evidence of communications
regarding the nature or substance of the scam phone calls.

acknowledge that such specific intent would be proven, had been proven, or was even part of the burden of proof.  *See infra* Part III.a.

## III.    Analysis

To find Hussain guilty of the charged conspiracy to commit wire fraud, the jury had to find beyond a reasonable doubt that (1) two or more people entered into an agreement, or conspiracy, to commit wire fraud and (2) Hussain knowingly and willfully joined the conspiracy "with knowledge of its fraudulent nature and with specific intent to defraud."  *See United States v. Lillemoe*, 242 F.Supp.3d 109, 115-16 (D. Conn. 2017), *aff'd sub nom. United States v. Calderon*, 944 F.3d 72 (2d Cir. 2019).[2]  It was not enough for Hussain to knowingly and willfully join any proven conspiracy or criminal agreement.  Hussain had to share the intent of those within the proven conspiracy, meaning he must also have had a specific intent to commit wire fraud.  *See Gaviria*, 740 F.2d at 183 ("[W]here the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statute[s].");  *United States v. Carlo*, 507 F.3d 799, 801 (2d Cir. 2007) ("To sustain a conviction for wire fraud under 18 U.S.C. § 1343 [] and conspiracy to commit such wire fraud, the government must prove that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim.").[3]

Hussain challenges the sufficiency of the evidence to prove this specific intent in

---

[2] *See also* Jury Instr. (doc. no. 208), at 26, 31.
[3] *Id.*

7

his Rule 29 motion, arguing that while he may have known he was moving criminally

derived funds, no evidence showed he knew the money was part of a wire fraud scheme

such that he could have had the requisite intent to commit wire fraud.[4]  The court agrees.

The prosecution highlighted two types of evidence at trial that, it argues, would

have allowed a jury to infer beyond a reasonable doubt that Hussain had specific

knowledge of the fraud scheme: (1) quasi-direct evidence of Hussain's actual knowledge;

and (2) circumstantial evidence showing the depth of Hussain's involvement in the

conspiracy.  But neither makes it any more likely that Hussain had the specific intent to

commit wire fraud, as opposed to some other crime.

**a.  Quasi-direct evidence**

As its strongest evidence of the defendant's culpable mental state to commit wire

fraud—and the only even remotely quasi-direct evidence on this point—the prosecution

points to a single text message exchange in Exhibit 30, a document compiling 1,632

Whatsapp messages occurring over a 17-month period between Yogesh Yadav, a

domestic U.S. account opener, and Hussain.[5]  Although this exchange is the prosecution's

lead point in its post-trial Rule 29 briefing, it bears noting that the jury was not presented

with this exchange at trial.  It is contained in a compilation exhibit containing over 1600

digital messages taking place over a period of a year and a half.  The jury heard no

evidence of the exchange, and the prosecution made no reference to it in opening or

---

[4] Mot. J. Acquit. (doc. no. 199), at 4-7; Suppl. Mot. J. Acquit. (doc. no. 240), at 7-11.
[5] Trial Ex. 30 (doc. no. 239-1), at 36.

closing argument.[6]  The messages are dated April 7, 2022:

> "Yadav: Whether the work will be done now or not, brother?
> Yadav: It's been a long time, March is also over.
> Hussain: Calls are not working properly for the last three months
> Hussain: That's why the work is going bad.
> Hussain: How many times have I given?
> Hussain: It is not happening/working
> Yadav: That's why (I am) not understanding anything
> Hussain: Yes
> Hussain: It didn't happen before
> Hussain: Because of this war.
> Hussain: Such a problem is going on
> Hussain: Work will be done, I will let you know"[7]

The government argues that this conversation shows that Hussain knew "calls" were responsible for "work" being done, and that the "calls" were "not working properly for the last three months," leading to "work [] going bad."[8]  Importantly, the prosecutors made no such argument to the jury, instead referring throughout trial only to other isolated portions of Exhibit 30 that referred to "work."[9]  Yadav's testimony at trial made clear that "work" referred only to the U.S.-based "bank account" component of the operation, with no reference to the scam call component that generated the fraud revenue.[10]  Yadav testified that "work" referred to money entering the accounts he had

---

[6] The prosecution's closing made reference to a different Hussain-Yadav Whatsapp exchange, also contained in Exhibit 30, (*see* Trial Tr. IV (doc. no. 236), 509:17-510:8).  That conversation made no reference to "calls," but rather to "work," which the government concedes (and only argued) was a reference to the domestic, bank-account component of the operation, and not the India-based scam call (wire fraud) component.  *Id.* at 510:2-4.

[7] Trial Ex. 30 (doc. no. 239-1), at 36.

[8] Gov't. Suppl. Opp'n. (doc. no. 239), at 8.

[9] *See, e.g.* Trial Tr. I (doc. no. 233), 163:15-164:4 (Yadav direct testimony); Trial Tr. IV (doc. no. 236), 509:17-510:8 (closing argument).

[10] Trial Tr. I (doc. no. 233), 164:2-4.  The prosecution stated at trial and agreed during Rule 29 oral argument that "work" referred only to the money laundering aspect of the conspiracy, and not to the scam call aspect of the conspiracy.  *See* Trial Tr. IV (doc. no. 236), 510:3-4 ("Yogesh

opened on Hussain's behalf.[11]  Circumstantially, the government points to Exhibit 150, a

summary spreadsheet describing fund movement within the scheme, showing that there

were no victim funds obtained in January 2022 and only one victim transfer of $19,500 in

each of February and March 2022,[12] corroborating the statement that "work [was] going

bad" during the first three months of 2022.  The government argues—although it made

no such argument to the jury, nor any other specific argument regarding this aspect of its

burden of proof[13]—that this statement shows that Hussain was aware that the scheme to

get money involved wire fraud, not some other form of crime.[14]

Yadav testified at trial that he first met Hussain in December 2019 thorough his

"very good friend" Pradip Sau.[15]  Before introducing them, Sau, an account opener, told

Yadav about opening bank accounts for Hussain.[16]  Yadav testified:

> "Pradip explained to me a little bit about to open the bank accounts,
> and that's how.  He explained to me a little bit about charities in
> back home in India that people called the call center. People called
> the people, like, random people, and they asked for some charities,
> and, if somebody wants to donate something, whatever the amount is
> going to be collected in your account, you will get the commission,
> 10 percent, from it. So I decided, and I agree on it, and then I went to
> Orlando, and then I met with Mr. Nasir."[17]

---

told you what he meant by that. The work in this case was earning money through the bank
accounts."); Oral Arg. Tr. (doc. no. 247), 31:6-11 ("THE COURT: …the work part is the bank
accounts part, not the defraud part, right? It's connected to the calls, yes, but the work part is the
bank account part. AUSA: Yeah.").

[11] Trial Tr. I (doc. no. 233), 164:2-4.

[12] *See* Trial Ex. 150, "Date" and "Amount" columns.

[13] *See* Trial Tr. IV (doc. no. 236), 506-530; 537-539.

[14] Gov't Suppl. Opp'n. (doc. no. 239), at 8.

[15] Trial Tr. I (doc. no. 233), 156:13-21.

[16] *Id.* at 157:11–158:9.

[17] *Id.* at 157:12-22.

While a conviction for conspiracy may rely on "inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation," *see Eppolito*, 543 F.3d at 45, Hussain's reference to "calls" and "work" is the only piece of quasi-direct[18] evidence showing that Hussain connected "calls" with the money coming into the accounts.  But this is insufficient to prove beyond a reasonable doubt that Hussain knew the nature of the scheme.  Even considering his reference to "calls" as being the source of the proceeds, the question remains: calls for what purpose? Calls are commonplace enough to make them consistent with any number of activities, both legal and illegal (for example, calls made to facilitate criminal purchases of goods or services).  *See United States v. Lorenzo*, 534 F.3d 153, 160 (2d Cir. 2008) (finding that the defendant's conduct in connection with a transfer of money was "suspicious and . . . indicative of participation in illegal behavior. But such a transfer is consistent with participation in a wide variety of offenses, and in light of the other evidence, is insufficient to prove [his] intent to participate in the conspiracy charged in the indictment.").

Criminal activities involving "calls"—bearing no relation to wire fraud with its requisite intent to deprive and harm victims, *see Carlo*, 507 F.3d at 801 (wire fraud

---

[18] The court refers to this evidence as "quasi-direct" because in one sense, it is direct evidence: a statement by the defendant in an electronic message.  But because it contains no acknowledgment of *fraudulent* calls or conduct, and because the jury heard no evidence about the text exchange, it strikes the court as something less than direct evidence, and thus quasi-direct.  Even if the jury ever saw, or ever discussed, this message exchange in Exhibit 30, it would have required an inference to connect a single isolated mention of "calls" (amid over 1600 other messages) to knowledge of, or intent to commit, wire fraud.

requires proof of "specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim")—could include extortion, prostitution, and street level retail drug trafficking.  *See United States v. Samaria*, 239 F.3d 228, 237 (2d Cir. 2001), *abrogated on other grounds by United States v. Huezo*, 546 F.3d 174 (2d Cir. 2008) (evidence that defendant transported boxes of stolen goods held insufficient to show his intent to engage in a conspiracy to receive or possess stolen goods because "the exterior appearance of the boxes was equally consistent with any number of different criminal offenses including the receipt and possession of drugs, illegal weapons, counterfeit currency, or the receipt of legal goods such as drug paraphernalia that would later be employed in a criminal endeavor.").  Or the reference to "calls" could simply show that Hussain was aware of Yadav's belief that the scheme was meant to facilitate charitable donations.

As noted above, this single mention of "calls" was never expressly presented to the jury during trial.  While the focus in Rule 29 motions is on evidence, not argument, the manner in which this trial was conducted is instructive.  No reference to the defendant's single isolated mention of "calls" during the entire text message exchange was made during the opening statement, the case-in-chief, or the closing arguments.  The text message was simply never presented, referred to, or argued as evidence that established Hussain's knowledge of or intent to commit wire fraud.

***Opening statement.***  The government's opening statement not only made no reference to any evidence demonstrating the defendant's knowledge of, or intention to commit, wire fraud, it did not acknowledge that such evidence was part of its burden of

proof.  The closest the prosecutor came to alluding to this required element of proof was a

conclusory statement at the end of the opening that the "defendant knowingly and

willfully joined a conspiracy to commit wire fraud."[19]

In fact, the opening statement implicitly highlighted the lack of any expected

evidence of knowledge of or intent to commit wire fraud:

> "So let's talk for a couple minutes about the scheme and parts of it.
> There are three.  First, there were calls [agreed by the parties to be
> the only aspect of the scheme involving wire fraud]; second, there
> were accounts; and third, there were transfers. So, first, the calls. As
> you will hear, individuals in the U.S., including some Vermonters,
> received communications and phone calls that led them to send
> money into accounts in the names of people they didn't know."[20]

The parties agree that this "first part" of the conspiracy involving scam calls was the only

component of the conspiracy involving substantive wire fraud.[21]  The prosecutor's

opening statement continued: "There are three parts of the fraud: the calls, *the accounts*,

and *the transfers*, and as you'll hear, *this defendant* was essential in setting up *the second

and third parts of that scheme*."[22]  Simply put, the prosecution never suggested to the jury

that they would hear evidence of the defendant's knowledge of or participation in the

wire fraud component of the scheme, or his intent to commit wire fraud.

**Trial.**  The trial evidence followed suit.  The jury heard no direct evidence of the

defendant's knowledge of, or intent to commit, substantive wire fraud (but heard

abundant evidence of the defendant's activities involving the "accounts" and "transfers" –

---

[19] Trial Tr. I (doc. no. 233), 101:5-6.
[20] *Id.* at 92:8-14.
[21] Oral Arg. Tr. (doc. no. 247), 5:6-8, 5:21-24, 21:5-8.
[22] Trial Tr. I (doc. no. 233), 93:2-5 (emphasis added).

the aspects of the scheme that the parties agreed, and the government conceded during

oral argument, did not involve substantive wire fraud).[23]

The single, somewhat obscure reference to "calls" by the defendant was never

presented to or heard by the jury. It was included in a 47-page exhibit, trial Exhibit 30,

containing 1,632 text messages that stretched out over a period of 17 months. Other than

an oblique reference to "calls" contained in a single text exchange, the exhibit contained

no other statement by the defendant indicating an awareness of "calls" for any reason,

much less knowledge that wire fraud activities generated the funds he directed through

the "accounts" and "transfers" components of the operation. The trial evidence did

include circumstantial evidence, discussed at length *infra* Part III.b, demonstrating the

defendant's knowledge that those funds were criminally derived, but no evidence of the

specific substantive crime involved.

***Closing argument.*** Much like its opening statement, the government's closing

argument never overtly acknowledged that the prosecution was even required to prove, or

that the evidence established, that the defendant knew of or had the "specific intent to

violate the substantive statute." *Gaviria*, 740 F.2d. at 183 (quoting *Soto*, 716 F.2d at 993).

The prosecution's discussion of other Hussain-Yadav text exchanges focused only on the

word "work," mentioned in other places in the voluminous Exhibit 30, which the

prosecution emphasized as referring to the money going into to accounts, *i.e.* the second

and third "accounts" and "transfers" components of the conspiracy, and not the scam

---

[23] Oral Arg. Tr. (doc. no. 247), 5:6-8, 5:21-24, 21:5-8.

calls/wire fraud component.[24]

The prosecutor eventually rhetorically asked, "Did he knowingly and willfully join the conspiracy…?  Did Nasir knowingly and willfully join that conspiracy, members of the jury? … He was the head of the *back-office operation collecting all of this money*."[25] No argument followed that the defendant knew of or intended to commit wire fraud.  The closing argument continued, "[s]o the final question is, was there an agreement to commit wire fraud?"[26]  But what followed was not an argument about the defendant's intent or knowledge vis-à-vis wire fraud, but rather an argument that wire fraud had occurred (which was shown beyond any doubt) and that "there was *an agreement*" the defendant had joined (also clearly proven).[27]

***Rebuttal.***  After defense counsel gave his summation focused solely on the lack of any proof of willful knowledge of or intent to commit wire fraud, the prosecutor's rebuttal included another reference to Exhibit 30, not to the single reference to "calls" but to a different text exchange regarding "work,"[28] which, again, the parties agree referred to the "accounts and transfers" component of the scheme and not the scam call/wire fraud

---

[24] *See* Trial Tr. IV (doc. no. 236), 510:2-511:1.  The court took great pains at the oral argument on the Rule 29 motion to clarify both (1) that references to "work" referred to accounts and transfers, and not to scam calls (wire fraud), and (2) that the prosecution was not arguing—either at trial or on the motion—that such evidence demonstrated knowledge of wire fraud.  The prosecutors repeatedly confirmed this understanding. *See, generally,* Oral Arg. Tr. (doc. no. 247); *see also id*. at 31:6-11 ("THE COURT: the work part is the bank accounts part, not the defraud part, right? It's connected to the calls, yes, but the work part is the bank account part. AUSA: Yeah."); Trial Tr. IV (doc. no. 236), 510:3-4 ("Yogesh told you what he meant by that.  The work in this case was earning money through the bank accounts.").

[25] Trial Tr. IV (doc. no. 236), 528:21-529:1 (prosecution's closing argument) (emphasis added).

[26] *Id*. at 529:6-7 (emphasis added).

[27] *Id*. at 529:25.

[28] *Id*. at 538:8-15.

component of the scheme. The very brief rebuttal then temporally juxtaposed the text exchange regarding "work" with the defendant's dubious statement to Yadav that the funds involved were "for charity."[29] As discussed *infra* Part III.b, the fact that Hussain provided inconsistent information to the account openers about the purpose of the accounts could show that he knew the account funds were criminally derived, but is not enough to show that he had specific knowledge of the wire fraud as opposed to any other crime or crimes.

***Oral argument.*** The oral argument of the defendant's motion proceeded somewhat curiously. The prosecution acknowledged what it had in its opening:[30] that the scheme involved separate components, and that the evidence established the defendant's personal involvement only in the "accounts" and "transfer" components, and not the scam calls component. The government further acknowledged that the "accounts and "transfers" components—with which the defendant was directly involved—did not involve wire fraud or defrauding any victims.[31] Counsel agreed that the jury heard no reference to the single April 2022 Hussain-Yadav text exchange amidst the thousands of messages in Exhibit 30.[32] And when the court noted that the government's closing did not include "an argument about knowledge of wire fraud on the defendant's part," the prosecutors agreed.[33]

---

[29] *Id.* at 538:25-539:4.
[30] Trial Tr. I (doc. no. 233), 92:8-93:8.
[31] Oral Arg. Tr. (doc. no. 247), 5:6-8, 5:21-6:4, 21:5-8.
[32] *Id.* at 9:25-10:3.
[33] *Id.* at 22:8-17.

The hearing took a somewhat unexpected turn, however, where the government seemed to argue that it needed only to prove that the defendant knowingly joined a conspiracy that *involved* a scheme to defraud, and not that he possessed knowledge of or intent to commit wire fraud. This line of argumentation continued to the point where the prosecution appeared to argue that it was not required to prove the defendant's specific intent to commit wire fraud, as required by cases like *Carlo*, 507 F.3d at 801 ("To sustain a conviction for wire fraud under 18 U.S.C. § 1343 [] and conspiracy to commit such wire fraud, the government must prove that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim."), or at least to question that part of its burden.[34] Eventually, the prosecutor posed a question to the court, and this exchange ensured:

> "AUSA: -- are you -- is it right then that you're saying that the absence of evidence that Mr. Hussain knew that the caller to the victim was a fraudulent call, that there was fraud in that call, is that what we're focusing on?
> THE COURT: Obviously, yes. I mean, that's the only thing we've been talking about, yeah.
> AUSA: Sorry to be slow in coming around.
> THE COURT: But what else is there to talk about? That's his motion, that the calls, that there's no evidence that this defendant

---

[34] *See id.* at 28:16-34:24. The Second Circuit held it a "basic requirement" that "'the person charged with conspiracy *knew* of the existence of the scheme alleged in the indictment and *knowingly joined and participated* in it.'" *Coplan*, 703 F.3d at 71 (quoting *Rodriguez*, 392 F.3d at 545) (also holding that "[i]n this case, an essential element of the conspiracy charged [] required proof beyond a reasonable doubt that [the defendant] joined the alleged conspiracy with the specific intent to violate the law.") (internal quotations omitted); *see also United States v. Ogando,* 547 F.3d 102, 107 (2d Cir. 2008) (quoting *Samaria*, 239 F.3d at 233 and citing *Rodriguez*, 392 F.3d at 545) (To sustain a conspiracy conviction, "the Government must show 'more than evidence of a general cognizance of criminal activity, suspicious circumstances, or mere association with others engaged in criminal activity'… [It must] present some evidence from which it can reasonably be inferred that the person charged with conspiracy knew of the existence of the scheme alleged in the indictment and knowingly joined and participated in it.").

knew that those calls were fraudulent, were wire fraud calls. He
didn't.  He just knows that there's -- he knows that calls are
somehow involved in what generates the money, but, again, that
could be calls about any number of things that may or may not be
wire fraud.  That's the point.  That's the problem.  That's why Mr.
Henry has been saying, Look, you got him for money laundering;
you just don't have him for wire fraud.  That's the whole argument,
yeah.  So I guess I am saying that.  *Is that not the law*?
AUSA: I need to -- *I can't answer that question on the fly*.
THE COURT: It's not a question on the fly.  That's the whole point
of this argument."[35]

The point here is not to criticize the government's presentation.  As stated

previously, the prosecution was competently, professionally, and effectively conducted;

after all, it resulted in a guilty verdict.  Rather, the point is to recognize that this particular

point of proof—the requirement to establish that the defendant knew of or intended to

commit wire fraud, *see Gaviria*[36] and *Carlo*[37]—was perhaps not a point of emphasis in

the government's case.  And in fairness, the prosecution had acknowledged this part of

their burden earlier in the hearing.[38]

The prosecution argued *after* trial that evidence proving the defendant's guilt

includes a text exchange that was never presented in open court.  The prosecution never

directed the jury to it, or elicited testimony from any witness about its meaning.  They did

not reference it during opening or closing arguments, or make any mention of their

---

[35] Oral Arg. Tr. (doc. no. 247), 34:3-34:24 (emphasis added).
[36] *Gaviria*, 740 F.2d at 183 ("[W]here the crime charged is conspiracy, a conviction cannot be
sustained unless the Government establishes beyond a reasonable doubt that the defendant had
the specific intent to violate the substantive statute[s].")
[37] *Carlo*, 507 F.3d at 801 (wire fraud conspiracy requires proof of "specific intent to obtain
money or property by means of a fraudulent scheme that contemplated harm to the property
interests of the victim.")
[38] Oral Arg. Tr. (doc. no. 247), 18:19-21.

theory, adduced for the first time in their supplemental, post-trial Rule 29 briefing, that

Hussain's use of the word "calls" demonstrated his knowledge of the wire fraud

scheme.[39]  And while that evidence is part of the trial record in the sense that it was

contained within an exhibit that was admitted to the jury, this court is "disinclined to

affirm a conviction based on a theory that was not advanced regarding a critical element."

*See United States v. Bouchard*, 828 F.3d 116, 127 (2d Cir. 2016) (citing *United States v.*

*Rigas*, 490 F.3d 208, 231 n. 29 (2d Cir.2007)) (reversing convictions for bank fraud and

making false statements to a bank where the jury may have been able to find that the

defendant knew his statements about a real estate transaction were false because of his

experience in the real estate industry, but "the Government never presented this theory of

[the defendant's] knowledge to the jury.")

 Without more evidence showing (or at least circumstantially suggesting, *see infra*

Part III.b) that Hussain knew that "calls" meant wire fraud instead of some other criminal

activity, or that the statement was not simply a reference to the "charity" story Yadav

recounted, a single mention of "calls"—buried in a single voluminous exhibit and never

expressly presented to the jury—cannot sustain an inference beyond a reasonable doubt

that Hussain had the requisite intent to defraud, much less a conviction.  *See Glenn*, 312

F.3d at 70 "[i]f the evidence viewed in the light most favorable to the prosecution gives

equal or nearly equal circumstantial support to a theory of guilt and a theory of

---

[39] Gov't. Suppl. Opp'n. (doc. no. 239), at 8.

innocence, then a reasonable jury must necessarily entertain a reasonable doubt.").[40]

**b. Involvement in conspiracy**

Hussain's counsel all but concedes that Hussain knew the deposits flowing into the accounts he controlled were criminal proceeds, and the prosecution produced circumstantial evidence allowing the jury to find that a conspiracy existed and Hussain was aware of the criminal nature of the conspiracy. The evidence established the existence of a large-scale conspiracy, possibly based in India, to defraud victims in the United States into transferring money to accounts held by the defendant, who in turn transferred the money to recipients in India. The prosecution argues that a jury could infer that Hussain had the requisite knowledge and specific intent to commit wire fraud from evidence of Hussain's close connections with his Indian co-conspirators, his "trusted role" in the conspiracy, and his inconsistent statements to account holders and law enforcement agents.

*Inconsistent statements.* Hussain recruited account openers Yogesh Yadav, Shashank Singh, Tarannum Khatoon, and Pradip Sau to open accounts on his behalf. He controlled the false (although not "wire fraudulent") information they gave banks when opening the accounts,[41] and he controlled the accounts themselves. Their testimony showed that he also conveyed to them certain information about what they were doing,

---

[40] In this case, the word "innocence" does not of course refer to moral or ethical innocence, but rather a lack of proven guilt of the substantive offense underlying the conspiracy.

[41] Importantly, the prosecution did not argue, and does not argue now, that the account openers' dealings with the U.S. banks constituted wire fraud. Throughout the Rule 29 motion practice, the government was clear that the defrauded victims were the individual scam victims, not the banks involved. *See* Oral Arg. Tr. (doc. no. 247), 5:5-6:4, 29:14-18.

telling different account openers different stories about why he needed them to open

multiple bank accounts for him.  For example, as mentioned above, Yadav learned from

Sau that the accounts were meant for "charities."[42]  Shashank Singh, by contrast, testified

that Hussain told him that people in the United States needed to have many bank

accounts opened in case the banks chose to close one of them for no reason.[43]  But the

fact that Hussain compartmentalized the information he shared with account holders is

not evidence that he had knowledge of the fraudulent (as opposed to other criminal)

origin of the funds going into the accounts, as the prosecution argues.[44]  For instance, the

same fact could also be read as showing that people at every level of the conspiracy made

efforts to conceal from those working for them the true nature of the conspiracy.  These

lies could show, and a reasonable jury could permissibly infer, that Hussain knew the

funds were criminal proceeds.  But the evidence does not create an inference that Hussain

knew they were the proceeds of wire fraud as opposed to other illegal activities.  *See,*

*e.g., Gaviria*, 740 F.2d at 184 ("[F]alsehoods told by a defendant in the hope of

extricating himself from suspicious circumstances are insufficient proof on which to

convict where other evidence of guilt is weak and the evidence before the court is as

hospitable to an interpretation consistent with the defendant's innocence as it is to the

---

[42] Yadav never mentioned questioning why charities would need to use accounts opened with false information.

[43] Trial Tr. I (doc. no. 233), 212:12-19.  The prosecution also points to the testimony of two other account openers, Neha Junaid and Tarannum Khatoon, who testified that they opened bank accounts for people associated with Nasir Hussain because they thought they would earn money from bank referral fees. But both testified that other people, not Hussain, explained the bank referral fees to them, so the basis for their understanding cannot be imputed to Hussain.  Trial Tr. III (doc. no. 235), 259-60, 325.

[44] Gov't Suppl. Opp'n. (doc. no. 239), at 19.

Government's theory of guilt.").

The prosecution, citing *United States v. Odiase*, 788 F. App'x 760, 762-63 (2d Cir. 2019), also argues that Hussain's false statements to law enforcement officers, in which he denied ever using Zelle, constitute evidence of "Hussain's knowledge and fraudulent intent."[45] The statements may be evidence of *criminal* intent in the sense that they were dishonest and deceptive, but it is not the required evidence of *fraudulent* intent, with its requisite intent to deprive and economically harm a victim or victims. *See Carlo*, 507 F.3d at 801. In *Odiase*, a money laundering case, the defendant made false statements about the origin of the money in her accounts, stating that it came from a man who purchased merchandise from her store. *Odiase*, 788 F. App'x at 763. The court found that the false statements, taken with the defendant's actions moving the money out of her accounts, could support an inference that she knew the funds were derived from criminal activity. *Id.* The same inference can be drawn here—Hussain's false statements to law enforcement were about his use of Zelle, the mechanism for his money laundering.[46] The statements, along with the other evidence in the case, also support an inference that Hussain knew the funds were derived from criminal activity, but *not* that he knew the nature of the fraudulent scheme. *See Nusraty*, 867 F.2d at 765 ("[A] false exculpatory statement by appellant could have proved that Nusraty, once arrested, knew that he was caught up in a situation involving criminal activity. However, his statement did *not* establish, nor was it sufficient for an inference to be drawn, that Nusraty knew of the

---

[45] *Id.* at 20.
[46] *Id.*

22

conspiracy charged.") (internal citations omitted) (emphasis in original).

    ***Connection to co-conspirators.***  The prosecution argues that Hussain had close connections with co-conspirators.  He was no doubt in contact with the apparently India-based callers, providing them with account numbers.[47]  But the government presented no evidence that Hussain knew of or conspired regarding the callers' conduct of inducing victims to transfer money into those accounts.  Similarly, Hussain was seemingly aware of the timing and size of the resulting transfers—referencing money coming into the accounts within days, or occasionally on the day of, the transfers from victims,[48] and noting in a text message at one point that a small amount of money would come through an account because it was at a "small bank."[49]  But no trial evidence showed how Hussain was connected to the callers, or any communications between them and Hussain.  Hussain could have been hired as a money launderer, or he could have been part of a large criminal organization that conducted numerous types of crime.  Because of the dearth of evidence showing the type of connection he had with the callers, who were the only conspirators engaged in wire fraud, the fact that he shared information about *the accounts alone* does not support an inference that he knew how the transferred funds were derived.

---

[47] The prosecution also points out that two people who received transfers from Hussain in India also visited him in the United States.  Gov't Suppl. Opp'n. (doc. no. 239), at 17.  But the prosecution did not provide any evidence to show that those two visitors were in any way related to the scam calls being *made*, only that they received money from Hussain's accounts and were based in India.

[48] *Id.* at 13-14.

[49] *Id.* at 14-15.

***Trusted role in conspiracy.*** Finally, the prosecution argues that Hussain's "trusted role" in the conspiracy would allow for an inference that he must have known the object of the conspiracy.[50] Hussain undoubtedly moved money from the accounts opened by his account openers to India, using Zelle and other wire transfer services.[51] Special Agent Bogdanowicz testified that $540,343.71 was transferred out of victims' accounts into Hussain-controlled accounts during the course of the scheme.[52] Of that money, $160,022.92 was traced to India,[53] while the rest went to the account openers, was used for account openers' travel, and presumably went to Hussain himself.[54] This evidence, considered in context, would allow the jury to infer permissibly that Hussain had the requisite intent to engage in a money laundering, but not a wire fraud, scheme. *See United States v. Huezo*, 546 F.3d 174, 181-82 (2d Cir. 2008). Like the defendant in *Huezo*, cited by the prosecution, Hussain actually moved the money, he had connections with co-conspirators who were engaging in money laundering, and he was paid for his services (and paid others for theirs). *Id.* But, unlike *Huezo*, as defense counsel argued at trial and in his motion, this is not a money laundering case—it is a wire fraud case, with its required showing (unlike money laundering) of a specific intent to defraud. *See Carlo,*

---

[50] *Id.* at 10, citing *United States v. Anderson*, 747 F.3d 51, 66-69 (2d Cir. 2014). The *Anderson* court acknowledged that "there must be limits to the inferences upon which the government may rely to establish a defendant's knowledge of the object of a conspiracy," noting that the knowledge inference was "heavily fact-specific." *Id.* at 68.

[51] He occasionally asked his account openers to transfer money to their family members in India, who then, in theory, transferred the funds to Hussain's contacts. Trial Tr. I (doc. no. 233), 175:22-25; Trial Tr. IV (doc. no. 236), 526:22-25.

[52] Trial Tr. I (doc. no. 233), 135:13-15; Trial Ex. 150, "Total $ Deposited."

[53] Trial Tr. I (doc. no. 233), 135:13-15; Trial Ex. 150, "Total $ Sent to India."

[54] *See, e.g.,* Trial Tr. I (doc. no. 233), 175:3-11, 212:5-8.

507 F.3d at 801 (wire fraud conspiracy requires proof of "specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim."). The circumstantial evidence may allow a permissible inference about Hussain's specific intent to launder money, but that inference cannot be made to stretch to his knowledge of the fraud scheme.

Although Hussain had sufficiently close contact with the callers to know soon after deposits were made, and to handle over $500,000 throughout the course of five years from 2018 to 2023, there was no evidence about the size of the scam call/wire fraud component of the conspiracy, nor how Hussain was linked to it. Pradip Sau potentially could have been provided information about the size of the conspiracy, but ultimately did not. The court excluded on Rule 403 grounds aspects of Sau's testimony about his direct involvement with the Indian co-conspirators, including his knowledge about the object of the conspiracy. Although Sau's excluded testimony may have allowed the jury to understand Hussain's relative role in the conspiracy, the fact of the matter is that the evidence was not admitted, and would have fallen short of establishing specific wire fraud intent on Hussain's part.

Evidence did come in at trial that Sau worked directly with the scam callers after an argument with Hussain.[55] That evidence undermines the prosecution's argument that Hussain's role in the conspiracy would allow an inference that Hussain was more than just involved in the conspiracy, but that he actually "engineered" it.[56] If Sau worked

---

[55] Trial Tr. I (doc. no. 233), 195-96.
[56] Gov't Suppl. Opp'n. (doc. no. 239), at 13, 15.

directly with callers in India without Hussain, then it appears Hussain did not "direct" the conspiracy as the prosecution argues, and Hussain's role proves little or nothing about his knowledge or specific *mens rea* relative to wire fraud.  *Cf. United States v. Jimenez*, 96 F.4th 317, 324-25 (2d Cir. 2024) (conspiracy to commit wire fraud proven where multiple witnesses testified to defendant being the "boss" of the wire fraud conspiracy, "instructing" co-conspirators on how to conduct the fraud, and purchasing the means by which the fraud was committed).

Had the substantive crime underlying the conspiracy been money laundering, as in *Huezo* and *Odiase*, instead of wire fraud, the circumstantial evidence of Hussain's involvement in the conspiracy would be persuasive because the fact that Hussain moved money to India, lied to account openers, and had them lie to banks, is convincing evidence that he knew the funds were illicit proceeds.  But, as with the defendants in *United States v. Torres*, *United States v. Lorenzo*, *United States v. Rodriguez*, *United States v. Cruz*, and *United States v. Samaria*, evidence of Hussain's participation in or furtherance of the conspiracy is not enough to show that he knew the object of the conspiracy.[57]  These cases show abundant Second Circuit Court of Appeals authority

---

[57] *See United States v. Torres*, 604 F.3d 58, 70 (2d Cir.2010) (evidence insufficient to show intent to join drug possession conspiracy where defendant never possessed package addressed to him); *Lorenzo*, 534 F.3d at 160-61 (evidence insufficient to show drug conspiracy where no evidence that defendant knew what was inside suitcases holding drugs); *United States v. Rodriguez*, 392 F.3d 539, 547 (2d Cir. 2004) (evidence insufficient to show intent to join drug conspiracy where defendant drove in car with conspirators and package of drugs, but no evidence that defendant knew what was inside of package or had sole possession of it); *United States v. Cruz*, 363 F.3d 187, 198-99 (2d Cir. 2004) (evidence insufficient to show intent to join drug conspiracy where defendant agreed to "watch" drug dealer's "back" during a "deal," actively conducted countersurveillance during a drug deal, and drove drug dealer, with package of drugs, to second location, but told law enforcement that he did not know what kind of deal had taken place);

supporting the idea that general involvement in illicit activities, even where sufficient to

show general criminal intent, is insufficient to establish the required specific intent to

commit the substantive offense that is the object of the conspiracy.

*Lorenzo* is particularly instructive.  There, a man in the Dominican Republic,

Amauri, recruited a woman to smuggle drugs to the United States in a suitcase.  *Lorenzo*,

534 F.3d at 155-56.  When she arrived in New York she was met by Amauri's associates,

including the defendant, Amauri's uncle.  *Id.* at 156.  The defendant told the woman that

Amauri had contacted him and asked him to take her to a nearby hotel.  *Id.*  At the hotel,

the defendant paid for her room for a night.  *Id.*  The next day, he returned to the hotel

with a brown bag containing $14,000 in cash.  *Id.*  He wrapped the bag of cash in clothes

and packed it in her suitcase, and she flew back to the Dominican Republic the same day.

*Id.*  The woman returned to the United States a month later, at Amauri's behest, where she

was arrested by Customs and Border Patrol agents with 3.25 kilograms of cocaine in her

suitcase.  *Id.* at 157.  She agreed to cooperate with a controlled delivery of the drugs.  *Id.*

She called Amauri, who told her to take a taxi, first directing her to a hotel, then, altering

course, to the defendant's house.  *Id.*  The defendant was asleep when she got to his

house, but his wife was awake and told the woman Amauri had called and asked them to

take her to the same hotel as before.  *Id.* at 157-58.  Once the women moved the suitcases

into the defendant's house, government agents arrested them and the defendant.  *Id.* at

---

*Samaria,* 239 F.3d at 237 (insufficient evidence of defendant's intent to engage in a conspiracy to
receive or possess stolen goods despite his presence in a car with boxes containing the goods
because "the exterior appearance of the boxes was equally consistent with any number of
different criminal offenses").

158.

The court found that, although the defendant "was present at and participated in events that furthered the conspiracy, there is insufficient evidence to show that he did so knowingly and with the specific intent to further a cocaine smuggling and distribution conspiracy." *Id.* at 160. The court noted that the $14,000 the defendant gave the woman to bring back to the Dominican Republic was "suspicious" and "indicative of participation in illegal behavior," but was "consistent with participation in a wide variety of offenses," and in light of the other evidence, "insufficient to prove [the defendant's] intent to participate in the [drug] conspiracy charged in the indictment." *Id.* Notably, the court found this was the case despite the fact that the defendant (1) was related to and had direct contact with Amauri, who organized the drug delivery from the Dominican Republic, (2) met with Amauri's associates in the United States, and (3) paid for the drug smuggler's hotel, in addition to the fact that he had $14,000 in cash that he sent back to the Dominican Republic through the drug smuggler.

Also worth noting is that *Torres*, *Samaria*, *Rodriguez*, and *Cruz* all concern conduct dealing in physical packages. In each of these cases the court found that, even though the defendants participated in moving packages containing contraband, the government had presented insufficient evidence to find that the defendants knew what was inside the packages. This shows that even when the potential object of the conspiracy is narrowed, for instance to conspiracies involving the shipment of physical objects that can fit inside of bags or boxes, the government still bears a burden to show that the defendant is aware of the *specific* object of the conspiracy, *i.e.* what is inside the

28

package.  For example, in *Torres*, the court found evidence that ten kilograms of cocaine had been sent via UPS from Puerto Rico to New York; the shipment was addressed to Torres; Torres "undertook to receive heavy and bulky packages on the street, which were addressed to him at a building with which he had no apparent connection"; Torres attempted to convince a UPS driver to release the shipment to him; and Torres, with others, went to a UPS Store to retrieve the shipment.  604 F.3d at 69-70.  The court found that, while this evidence supported the inference that Torres intended to possess contraband as part of a conspiracy, it did not support the inference that Torres "must have known" that he was dealing with narcotics, in part because, among other things, the government had produced inadequate evidence of the nature of the relationship between Torres and the conspiracy's principals.  *Id.* at 70-71.

When, as here, the evidence is in equipoise, the Constitution does not permit a conviction based on evidence that leads to inferences equally consistent with proof beyond a reasonable doubt, and a failure of such proof.  *Coplan*, 703 F.3d at 69.  Here, the jury could permissibly infer that Hussain was aware he was part of a large criminal conspiracy because he communicated basic account information to the callers, handled $540,000 over the course of five years, sent money to India, hosted in the United States two people who ultimately received funds from his accounts, lied to account openers, and once used the word "calls."  But without more evidence of Hussain's connections to the callers committing the fraud, as in *Huezo*, or that he knew what the callers were doing, the evidence is equally likely that he believed the underlying goal of the conspiracy was any number of potential crimes.  *See Lorenzo*, 534 F.3d at 160; *Samaria,* 239 F.3d at 237;

29

*see also supra* Part III.a.

## IV.    Conclusion

The court only grants a motion for a judgment of acquittal contravening a jury's guilty verdict with great reluctance.  But to sustain a conviction of conspiracy to commit wire fraud, the prosecution "must prove that the defendant acted with specific intent to obtain money or property by means of a fraudulent scheme that contemplated harm to the property interests of the victim." *Carlo*, 507 F.3d at 801.  The prosecution certainly argued that wire fraud had been committed, which was proven beyond any doubt by the victims' testimony.  But the government made no attempt to describe in its opening statement, demonstrate during its case-in-chief, or expressly argue in its closing that the defendant was specifically aware of wire fraud, or desirous of participating in a conspiracy to commit it (as opposed to generally participating in a "scheme," or handling the proceeds of some unspecified crime or crimes).  This is not to suggest that the government conceded the issue, but it is a strong indication of the lack of trial evidence on this crucial point.

Evidence that Hussain "engaged in conduct which could have been in furtherance of a plan to [defraud victims] if [he] had known" of it, "is not evidence that he did know" of it.  *See Ingram v. United States*, 360 U.S. 672, 680 (1959) ("[W]ithout the knowledge, the intent cannot exist.  Furthermore, to establish the intent, the evidence of knowledge must be clear, not equivocal.  This, because charges of conspiracy are not to be made out by piling inference upon inference, thus fashioning a dragnet to draw in all substantive crimes.") (cleaned up); *see also Nusraty*, 867 F.2d at 764 ("[M]ere association with those

implicated in an unlawful undertaking is not enough to prove knowing involvement.").

"If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *Glenn*, 312 F.3d at 70. The evidence against Hussain, viewed in the light most favorable to the government, remains at best, in equipoise. *Coplan*, 703 F.3d at 69 ("Because '[i]t would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty,'" evidence in "equipoise" cannot support a conviction) (citations omitted). Because the evidence adduced at trial was sufficient to show that Hussain knowingly took part in a money laundering conspiracy, but insufficient to show he had the requisite knowledge of or intent to commit wire fraud under 18 U.S.C. § 1349, the defendant's motion for judgment of acquittal[58] is granted.

SO ORDERED.

_____
Joseph N. Laplante
United States District Judge

Date: March 12, 2025

cc: Counsel of Record

---

[58] Doc. no. 199.